# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SAUNDRA KAY MCMANIS,

                       **Plaintiff,**

     **v.**                                   **Civil Action 2:18-cv-491**
                                            **Judge Michael H. Watson**
                                            **Magistrate Judge Jolson**

COMMISSIONER OF
SOCIAL SECURITY,

                       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Saundra Kay McManis, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her Disability Insurance Benefits. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

### A.    Prior Proceedings

Plaintiff applied for Disability Insurance Benefits ("DIB") in October 2014, alleging disability due to a number of physical and mental impairments. (Tr. 174, PAGEID #: 226). Plaintiff alleged an onset date of January 1, 2013. (*Id.*).

After initial administrative denials of Plaintiff's claims, Administrative Law Judge Catherine Ma ("the ALJ") heard the case on May 12, 2017. (Tr. 38–85, PAGEID #: 87–134). On September 26, 2017, the ALJ issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 10–25, PAGEID #: 59–74). Plaintiff requested a review

of the Hearing and the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6, PAGEID #: 50–55).

Plaintiff filed this case on May 17, 2018, and the Commissioner filed the administrative record on July 23, 2018. (Doc. 7). Plaintiff filed a Statement of Specific Errors on September 9, 2018 (Doc. 8) and the Commissioner responded on September 30, 2018 (Doc. 10). No reply was filed. Thus, this matter is now ripe for review.

**B. Relevant Hearing Testimony**

Plaintiff was 61 years old at the time of the hearing. (Tr. 46, PAGEID #: 95). At the hearing, Plaintiff testified about both her physical and mental issues; however, because Plaintiff's argument relates only to her mental impairments, the Court focuses on testimony regarding the same. Plaintiff testified that she lives in a two-story house with her husband and three dogs. (Tr. 45, PAGEID #: 94). She has her GED and attended Daymar College for three quarters. (Tr. 46, PAGEID #: 95). At the time of the hearing, Plaintiff was 5'1" tall and weighed 225 pounds. (Tr. 47, PAGEID #: 96). She explained that her husband has received disability benefits since becoming injured in a 1986 mining accident and that she receives food stamps and has a medical card. (Tr. 48, PAGEID #: 97).

As to her work history, Plaintiff worked at Ponderosa, from 2006 to 2013. She first served as a food bar worker, before being promoted to shift coordinator, and eventually to assistant manager. (Tr. 49–50, PAGEID #: 98–99). As shift coordinator, Plaintiff explained that her responsibilities included ensuring that employees were on task, managing customer complaints, and disciplining employees when necessary. (Tr. 53–54, PAGEID #: 102–03). As assistant manager, she was primarily responsible for scheduling and customer service. (*Id.*). When asked to describe the circumstances surrounding her departure from Ponderosa, Plaintiff explained that

she was frustrated both because upper management would not act after she reported that her manager was stealing and because her prep cooks had failed to show up to work that day. (Tr. 58–59, PAGEID #: 107–08).

In response to the ALJ's question concerning her inability to work, Plaintiff explained that she was "afraid of hurting somebody or myself because [she] get[s] such anger" and that she does not know how to deal with her "built up" anger. (Tr. 59, PAGEID #: 108). Plaintiff testified that she sees a therapist at Woodland Centers on a monthly basis and takes BuSpar, Abilify, and Paxil for her "nerves." (Tr. 60, PAGEID #: 109). She explained that, because of her mental health issues, she does not leave the house and does not often associate with others. (*Id*.). She also testified, however, that she spends a significant amount of time with her husband, daughter, and adult grandchildren, all of whom help her with household chores. (*Id*.). Plaintiff's grandchildren visit approximately once a week, and her daughter generally visits every other night. (Tr. 61, PAGEID #: 110). She also stays in touch with a friend over the phone on a monthly basis. (*Id*.). As to her daily activities, Plaintiff testified that her family members handle most of the grocery shopping and housework and that she cooks simple meals, albeit infrequently. (Tr. 64–65, PAGEID #: 113–14). She explained that she spends most of her days in her lounge chair either sleeping, watching TV, or listening to music. (Tr. 66, PAGEID #: 115).

In response to her attorney's questions about her ability to focus, Plaintiff explained that "[i]t feels like the whole world is crashing in all around me, and everybody's gathering up on top of me, and just suffocating me" and that she "just want[s] to be left alone." (Tr. 68, PAGEID #: 117). Plaintiff testified that she was a "nervous wreck" in anticipation of the hearing and took an extra pill to help with her symptoms. (*Id*.). Plaintiff's attorney then asked her to describe her anger:

Q. So tell us more about your anger. How frequently do you get angry, and what kinds of things make you angry?
A. I get angry every day. It doesn't take much to make me angry.
Q. What kinds of things might make you angry?
A. I can watch a simple television show, and be mad because of the, of a commercial, or, or someone can knock on my door, and I'll be mad because they're coming and bothering me.
Q. So how does that anger come out, or what - -
A. Sometimes I knock things off the tables. I have broken dishes before because I was mad, just smashed them and cracked them.
Q. How frequently does stuff like that happen?
A. Once every couple months maybe if I get really, really angry.
Q. What other things do you do more frequently than that? How does your anger come out?
A. It comes out in the way I treat people.
Q. And what does that mean?
A. That I'm mean to my family members when they try to help me.
Q. Okay. Are you loud?
A. I'm very loud.
Q. Do you use not nice words?
A. I use not nice words, and I call you everything but a - -
Q. Do you swear?
A. Oh, yes. I say things that I shouldn't say.
Q. How frequently do you do that?
A. Every day. I'm cussing every day at something, or somebody.

(Tr. 68–69, PAGEID #: 117–18).

In response to her attorney's questioning, Plaintiff explained that she stopped driving because she gets "road rage." (Tr. 72, PAGEID #: 121). Plaintiff testified that she does spend time with family and has good days and bad days. (*Id.*). For example, she attended a baby shower when she was having a good day. (*Id.*). She stated that she has not had thoughts of harming herself for a long time, but that she has thoughts of harming other people and "just want[s] to slap people every time [she] get[s] around them" because they "aggravate [her] so bad." (Tr. 72–73, PAGEID #: 121–22).

Finally, at the hearing, a vocational expert ("VE") opined that an individual with Plaintiff's age, education, relevant work experience, and residual functional capacity could return to all of

her past relevant work both as she generally and actually performed the work. (*See generally* Tr. 77–81, PAGEID #: 126–30).

## C. Relevant Medical Background

Plaintiff's arguments concern her mental impairments only, and the Court consequently examines the relevant medical evidence pertaining to the same.

On January 23, 2014, Plaintiff was treated at Riverside Hospital and was noted to be positive for anxiety but was in no acute distress and was alert and oriented. (Tr. 287, PAGEID #: 341). Plaintiff first saw her primary care physician, Dr. Ash, on April 29, 2014. (Tr. 336–37, PAGEID #: 390–91). Plaintiff stated she had "suicidal ideations" but Dr. Ash was "unable to assess" such ideations. (Tr. 336, PAGEID #: 390). Dr. Ash reported Plaintiff's emotional state as "appropriate" and noted that she was "pleasant," alert, oriented, and in no acute distress. (Tr. 337, PAGEID #: 391). Dr. Ash noted Plaintiff's anxiety, along with other physical issues, and prescribed Plaintiff medication for her anxiety. (*Id*.). In June 2014, Plaintiff experienced choking episodes and reported smoking marijuana to help calm her nerves. (Tr. 331–32, PAGEID #: 385– 86).

During a January 12, 2015 follow-up appointment, Dr. Ash prescribed Plaintiff additional medication for her depression and anger. (Tr. 543, PAGEID #: 597). Plaintiff "denies any homicidal or suicidal ideations and states she loves and takes care of her grandchildren and because of her faith she knows she could not kill herself." (*Id*.). On January 27, 2015, Plaintiff presented to Riverside Hospital, complaining of shortness of breath and chest pain. (Tr. 289, PAGEID #: 343). Plaintiff was found to be positive for anxiety. (Tr. 290, PAGEID #: 344). On March 17, 2015, Plaintiff told Dr. Ash that her depression was well controlled with medications and that, because of her medications, she felt like she could get out of bed in the morning, bathe, get dressed,

and tend to her daily activities. (Tr. 536, PAGEID #: 500). Dr. Ash noted, however, that Plaintiff "states she remains extremely angry and very irritable" and "that she does not want to be around people and everything and everybody makes her mad[.]" (*Id.*). Consequently, he referred Plaintiff to psychiatry for her anger and irritability. (*Id.*).

Plaintiff began receiving treatment at Woodland Centers Inc. for her mental health problems in March 2015. (Tr. 545, PAGEID #: 599). During her diagnostic assessment, Plaintiff explained that she is "angry all the time," "wake[s] up angry," and sought out treatment to "talk to someone" and "work on her anger." (*Id.*). Plaintiff's therapist, Mary Brown, opined that Plaintiff "has had anger issues and inability to regulate emotions for approximately three years" but also noted that she "has found through diagnosis of primary doctor that her thyroid is not working properly and has been diagnosed with hypothyroidism, which may be contributing to client's symptoms." (Tr. 548, PAGEID #: 602). Brown also opined that Plaintiff was at a low risk of harm to herself and no reported risk of harm to others. (Tr. 553, PAGEID #: 607). March 19, 2015 progress notes from Woodland Centers provide that Plaintiff was "unable to control anger, depression and anxiety symptomatology," but that she was "very cooperative and open during assessment." (Tr. 749, PAGEID #: 804). On April 1, 2015, Plaintiff told her therapist that she still struggled with anger issues, but that she "fel[t] better already since coming to therapy[.]" (Tr. 752, PAGEID #: 807). A week later, Plaintiff expressed she was looking forward to her birthday party that her family was hosting for her the next day, but that she was "still aggravated" regarding her anger outbursts. (Tr. 753, PAGEID #: 808). She also told her therapist that she was willing to work on breathing exercises to cope with her anger and reported "better mood and ability to control thoughts faster since beginning therapy[.]" (Tr. 754, PAGEID #: 809). On April 14, 2015, she opened up to her therapist about various family issues, including abuse, and was "very

engaging and open in session." (Tr. 757, PAGEID #: 812). Plaintiff remarked that she "feels safe" talking with her therapist about these issues. (*Id.*).

During a May 4, 2015 therapy session, Plaintiff reported that her symptoms had improved since increasing her medications and that she had enjoyed spending the previous day with her sister, stating, "[i]t felt great to get some sun" and plant flowers. (Tr. 760, PAGEID #: 815). She also reported guilt stemming from family issues but attributed her overall change in attitude to medications and therapy. (Tr. 761, PAGEID #: 816). Approximately one week later, Plaintiff described her anger related to family issues but stated that she was enjoying outdoor activities and spending time with other people, explaining, "I swear it's the Abilify that's made it better." (Tr. 762–63, PAGEID #: 817–18). June 4, 2015 therapy notes provide that Plaintiff "has had difficulty getting along with her daughter for several years and finds it difficult to control her temper when her daughter makes her mad." (Tr. 767, PAGEID #: 822). Therapy notes, dated June 30, 2015, list "several successes between visits," including "being able to hold her tongue with her daughter" and going to work at a senior center without "getting upset" with anyone. (Tr. 771, PAGEID #: 826).

On June 11, 2015 and June 16, 2015, Plaintiff underwent a psychological evaluation with Boris Todorov, Ph.D. (Tr. 422, PAGEID #: 476). Dr. Todorov administered a Personality Assessment Inventory ("PAI"), the Beck Depression Inventory, and the Beck Anxiety Inventory. (Tr. 425–27, PAGEID #: 479–81). Based on his findings, Dr. Todorov noted the following "diagnostic impression[s]": Somatic Symptom Disorder, Major Depressive Disorder—Recurrent and Moderate, and Generalized Anxiety Disorder, with a Global Assessment of Functioning ("GAF") of 50. (Tr. 427, PAGEID #: 481). He found that Plaintiff presented with a moderate to severe depressed mood and generalized anxiety, with poor coping skills and difficulty self-

regulating difficult emotions. (*Id.*). Consequently, he opined that Plaintiff would have "poor" abilities coping with work stress and behaving in an emotionally stable manner; "fair" abilities relating to coworkers, interacting with the public, using judgment when interacting with the public, maintaining attention and concentration, relating predictably in social situations, and demonstrating reliability; and "good" abilities following work rules, interacting with supervisors, functioning independently, carrying out detailed, but not complex job instructions, carrying out simple job instructions, and maintaining personal appearance. (Tr. 430–32, PAGIED #: 484–86).

On August 13, 2015, Plaintiff told her therapist that she was doing "so much better than when [she] first started coming" and that she "feels so good right now[.]" (Tr. 778, PAGEID #: 833). On September 21, 2015, Plaintiff was pleased both to have had no recent arguments with family members and with being able to clean her home. (Tr. 785, PAGEID #: 840). Therapy notes from December 14, 2015, indicate that Plaintiff felt sad about her youngest granddaughter moving out of her home, but that she would force herself to get up "most of the time" and that her husband encouraged her to do so as well. (Tr. 790–91, PAGEID #: 845–46).

During a February 17, 2016 therapy session, Plaintiff was pleased that she had assisted her friend following surgery and agreed that she was able to "manage remaining problems on her own with skills she has learned through therapy[.]" (Tr. 793, PAGEID #: 848). Records from March 2016 indicate that Plaintiff was doing well, but that Dr. Ash increased her medications because of Plaintiff's concern that her symptoms were returning. (Tr. 449, PAGEID #: 503). During the exam, Dr. Ash noted an appropriate emotional state and that Plaintiff was pleasant, alert, oriented, and in no distress. (Tr. 449–50, PAGEID #: 503–04.). A review of symptoms in April 2016, noted Plaintiff's euthymic mood, with no signs of restlessness, no anxiety, no depression, and no psychological symptoms. (Tr. 446, PAGEID #: 500). At a July 2016 appointment with Dr. Ash,

Plaintiff reported that her anxiety and depression were doing well, and Dr. Ash noted Plaintiff's pleasant behavior and appropriate emotional state. (Tr. 441–42, PAGEID #: 495–96).

In January 2017, Plaintiff told her therapist that she did not like to go shopping, experienced road rage, and had difficulties with her anger and impulse control. (Tr. 797–98, PAGEID #: 852–53). On March 2, 2017, Plaintiff reported anger over the Nielsen ratings, her neighbor's dog, and road rage. (Tr. 861, PAGEID #: 916). During a March 13, 2017 appointment with Dr. Ash, Plaintiff reported she no longer needed medication for sleep, felt things were going well, and that she was doing well on her medication. (Tr. 882, PAGEID #: 971). Dr. Ash's exam notes indicate that Plaintiff was pleasant, alert, oriented, and in no acute distress. (Tr. 883, PAGEID #: 938). In April 2017, Plaintiff reported feeling "very stressed" in anticipation of her upcoming disability benefits hearing. (Tr. 865, PAGEID #: 920).

### D.     The ALJ's Decision

The ALJ found that Plaintiff remained insured for disability insurance benefits through March 30, 2018, and that she had not engaged in substantial gainful activity since her alleged onset date of January 1, 2013. (Tr. 13, PAGEID #: 62). The ALJ determined that Plaintiff suffered from the following severe impairments: chronic obstructive pulmonary disease (COPD), disorders of the spine, and osteoarthritis and allied disorders. (*Id.*). Additionally, the ALJ determined that Plaintiff suffered from non-severe impairments, including hiatal hernia, GERD, a senile nuclear cataract, and anxiety and depressive disorders. (*Id.*).

As for the opinion evidence, the ALJ assigned Plaintiff's GAF score ranging from 50 to 55 "little weight," noting, in part, that GAF scores "do not provide a reliable longitudinal picture of the claimant's mental functioning." (Tr. 14, PAGEID #: 63). Next, the ALJ assigned the opinion of examining psychiatrist, Boris Todorov Ph.D., "little weight." Dr. Todorov opined that Plaintiff

had a poor subjective functional capacity that would prevent her from participating in the workforce, that she would be usually precluded from behaving in an emotionally stable manner in dealing with work stress, and would be precluded at times, from such things as maintaining attention and concentration. (Tr. 15, PAGEID #: 64). In assigning his opinion little weight, the ALJ noted that Dr. Todorov's opined functional limitations and conclusory statements were "inconsistent with the exam findings noted above that do not suggest any significant issue with interpersonal relations during the exam, with average intellectual functioning, in fact improving over time, no issues with inattention, and no issues with personal care or grooming." (*Id*.). Accordingly, the ALJ concluded that "the objective findings do not support the claimant's self-reported subjective complaints, upon which [Dr. Todorov's] opinion relies." (*Id*.). She also found that "the longitudinal treatment history and contemporaneous treatment notes [were] inconsistent with the opinions of Dr. Todorov." (*Id*.). Therefore, the ALJ concluded, "[g]iven the overall improvement with medication and treatment," that Dr. Todorov's opinion was entitled to little weight and that Plaintiff's mental health conditions were non-severe. (*Id*.).

The ALJ then went on to assess the "paragraph B" criteria of Listings 12.04 and 12.06. (Tr. 15–17, PAGEID #: 64–66). She found that Plaintiff has no limitation in the area of understanding, remembering, or applying information. (Tr. 16, PAGEID #: 65). She explained that Plaintiff "alleges significant limitations that are not consistent with or supported in the medical and clinical evidence[.]" (*Id*.). She noted, for example, that Plaintiff "does not need special reminders to take care of personal needs or grooming," is able to prepare her own meals, perform occasional household chores, volunteer at a soup kitchen and with senior citizens, and care for her grandchildren. (*Id*.). The ALJ also referred to record evidence of Plaintiff's average intellectual functioning and "adequate fund of knowledge." (*Id*.). Next, the ALJ found that

Plaintiff has a mild limitation in the area of interacting with others. (*Id*.). She explained that while Plaintiff has reported significant difficulty getting along with others, "the severity of these claims is not supported in the evidence." (*Id*.). The ALJ noted that, for instance, Plaintiff is capable of short trips to the grocery store, "suggesting an ability to function in a public setting," that she has a friend with whom she regularly stays in touch, that, according to the record, she volunteers in her community, and that both treatment and counseling notes indicate that medications and treatment helped to improve her mood regulation. (*Id*.). Moreover, the ALJ found that Plaintiff's treating providers "overall do not indicate that the claimant has any particular difficulty getting along with others within the treatment setting [ ] despite her allegations of difficulty dealing with others" and that during exams, Plaintiff was "routinely cooperative, and at times demonstrated a euthymic mood." (*Id*.).

In the area of concentration, persistence, or maintaining pace, the ALJ found that Plaintiff has a mild limitation. (*Id*.). She relied, in part, on the fact that Plaintiff can prepare her own meals, does not need special reminders to take care of personal needs or grooming, cares for her grandchildren, and volunteers. (*Id*.). Finally, as to her ability to adapt and manage herself, the ALJ found that Plaintiff has a mild limitation. (*Id*.). The ALJ reiterated the fact that Plaintiff does not need special reminders to take care of personal needs or grooming, that her weekly pill bottles "suggest[] a minimal and self-organized system," and that health records do not indicate any issues with hygiene or dress at evaluations. (Tr. 17, PAGEID #: 66). Moreover, ongoing therapy notes indicate Plaintiff's reports of continued improvement and "while she reported stressors due to situational factors, she was cooperative during sessions." (*Id*.).

Upon consideration of the record, the ALJ determined that Plaintiff retained the following residual functional capacity ("RFC") to:

perform medium work … except the claimant is limited to no more than frequent exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards.

(Tr. 19, PAGEID #: 68). In explaining her RFC determination, the ALJ noted, in part, that while Plaintiff "alleged limitations from conditions including arm pains, thyroid issues, and fatigue, as well as the psychological issues discussed above," ultimately, the "objective medical evidence [] does not document clinical findings of physical or mental status abnormality that establish total disability, as defined by the Social Security Act, or that corroborate the degree of symptomatology and limitation the claimant has alleged in support of her application." (Tr. 19–20, PAGEID #: 68–69). As part of her RFC analysis, the ALJ relied on her previous analysis concerning the severity of Plaintiff's mental health symptoms and provided the following explanation:

> The claimant's activities of daily living during the period relevant to this adjudication have not been supportive of or consistent with her alleged symptoms or limitations. While the claimant alleges significant limitations that are not consistent with or supported in the medical and clinical evidence, she also reported that she does not need special reminders to take care of personal needs or grooming, and while she reported a need for reminders with medication . . . suggesting a minimal and self organized system. She indicated that she could prepare her own simple meals and perform occasional household chores though with encouragement. She indicated that her family members do the shopping, though she is capable of short trips, suggesting an ability to function in a public setting. The claimant testified she has a friend with whom she keeps in regular contact. The medical evidence also indicates volunteering activities at a soup kitchen and with senior citizens, that are inconsistent with her allegations. I find that the nature of these reported activities are internally inconsistent, and inconsistent with the allegations of severe pain and disabling symptoms made in connection with this application.

(Tr. 20, PAGEID #: 69).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Although Plaintiff sets forth just one error, her asserted error is actually twofold: First, Plaintiff alleges that the ALJ failed to substantially support her treatment of opinions offered by examining medical expert, Dr. Todorov. (*See generally* Doc. 8 at 10–15). Further, Plaintiff contends that the ALJ failed to substantially support her conclusion that Plaintiff's mental health conditions are "non-severe." (*Id*.).

### A. Assessment of Dr. Todorov's Opinion

Plaintiff alleges that the ALJ erred in assigning little weight to Dr. Todorov's opinion. (*See generally id*.). Plaintiff emphasizes that Dr. Todorov's examination consisted of both an examination and administration of the Personality Assessment Inventory, "including validated testing results, as well as his expertise as a mental health professional." (*Id*. at 12). Plaintiff seems to suggest that the ALJ was required to adopt Dr. Todorov's opinion because the ALJ "did not have the expertise to independently draw her own medical conclusion." (*Id*. at 13). Despite Plaintiff's allegation that the ALJ "played doctor" (*id*. at 12), the Court finds that substantial evidence supports the ALJ's decision to assign little weight to Dr. Todorov's opinion.

While ALJs must consider opinions from medical sources, ALJs are the ones responsible for weighing the record evidence, determining whether an impairment is severe, and deciding whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520b, 404.1521 (explaining that "[a]fter we review all of the evidence relevant to your claim, we make findings about what the evidence shows."). Relevant here, ALJs are not required to rely on medical opinions at face value, but instead must evaluate medical opinions based on their consistency with and support from "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c), (d) (2), (3), (4). An ALJ must also "consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the medical opinion." *Id*. at (c)(6). *See also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) (finding that the ALJ did not substitute his opinion for that of the physician because the ALJ "properly discussed objective evidence in the record that demonstrates [plaintiff's] symptoms lessen when she is compliant with her medication . . . and that she can tolerate certain limited social interactions, such as shopping and interacting with her boyfriend."); *Smith v. Astrue*, No. CIV.A 4:09-cv-46-J, 2009 WL 4928035, at \*4 (W.D. Ky. Dec. 14, 2009) (noting that plaintiff "argues as though this is the only acceptable opinion in the record and no other medical evidence" and upholding the ALJ's decision because it was "based on the ALJ's study of the record as a whole.").

Here, for the ALJ to have adopted Dr. Todorov's opinion, she must have found his opinion "well-supported and not inconsistent with other substantial evidence in the record." *See* SSR 96-2p. The ALJ, however, found, based on the record and Plaintiff's own testimony, that Dr. Todorov's opinion did not satisfy this standard. Specifically, the ALJ found that Dr. Todorov's opinion was both internally inconsistent and inconsistent with the record as a whole. For example, the ALJ found that Dr. Todorov's opinion was inconsistent with his own exam findings, which did

not suggest any significant issue with interpersonal relations; showed average intellectual functioning; and no issues with inattention, personal care or grooming. (Tr. 15, PAGEID #: 64). She also found that Dr. Todorov's opinion was based on Plaintiff's self-reported complaints, which she also found to be inconsistent with exam findings and evidence in the record. (*Id*.). The ALJ elaborated on her opinion:

> On June 1, 2015, Dr. Ash, the claimant's treating physician, noted an appropriate emotional state and further noted that the claimant was volunteering at a soup kitchen. Though [] concerned if she could continue due to standing concerns, she did not report any psychological difficulties, which I find inconsistent with the alleged limitations from Dr. Todorov. In August 2015, the claimant reported that therapy was going very well, and the claimant reported her anxiety and depression was [sic] doing well on the medication, noting that she does not take Trazodone very often. In November 2015, she again reported her anxiety and depression was [sic] doing pretty well with medications. In a follow up visit with Dr. Ash in March 2016, she again reported she was doing very well. She reportedly felt her symptoms may be returning resulting in an increase in her Abilify, though Dr. Ash noted an appropriate emotional state and an exam noted she was pleasant, alert, and oriented, and in no distress. A review of symptoms in April 2016 noted a euthymic mood, with no signs of restlessness, no anxiety, no depression, and no psychological symptoms. In July 2016, Dr. Ash noted her anxiety and depression continued to be doing well with an appropriate emotional state and pleasant behavior in the exam. In March 2017, she reported she was no longer taking gabapentin and trazodone as she no longer had trouble sleeping, felt things were going well, and reported she was doing well with her medication. An exam continued to note she was pleasant, alert, oriented, and in no acute distress, and Dr. Ash noted a history of irritability for which medications were helping and she was feeling better. Ongoing therapy notes also indicate that the claimant continued to report improvement with the medication and counseling, and while she reported stressors due to situational factors, she was cooperative during sessions. The claimant indicated that she was successful in meeting her goals of refraining from impulsive behavior and reducing her anger.

(*Id*.).

It was proper for the ALJ to consider these inconsistencies when assessing Dr. Todorov's opinion. *See, e.g.*, *Urbanczyk v. Berryhill*, No. CV 16-12139, 2017 WL 4925739, at *3–5 (E.D. Mich. July 21, 2017), *report and recommendation adopted sub nom. Urbanczyk v. Comm'r of Soc. Sec.*, No. 16-12139, 2017 WL 4296606 (E.D. Mich. Sept. 28, 2017) (rejecting plaintiff's argument

that the ALJ "played doctor" and finding that the ALJ properly considered evidence regarding plaintiff's social functioning, including the fact that he spent time with his grandchildren, was cooperative during examinations, and had no problem following written instructions); *Bouschor v. Colvin*, No. 2:15-CV-47, 2016 WL 336099, at *5 (W.D. Mich. Jan. 28, 2016) (finding that the ALJ did not substitute his medical judgment for that of plaintiff's doctor simply because he did not assign great weight to the medical opinion regarding plaintiff's mental health). Further, the ALJ did not err in discounting portions of Dr. Todorov's opinion that were based in large part on Plaintiff's self-reports. *See, e.g.*, *Johnson v. Colvin*, No. cv 7:15-039-DCR, 2016 WL 3257124, at *4– 5 (E.D. Ky. June 13, 2016) (citing *Smith v. Comm'r of Soc. Sec. Admin.*, 564 F. App'x 758, 764 (6th Cir. 2014)).

Plaintiff also contends that the ALJ "cherry picked" the record to support her assessment of Dr. Todorov's opinion. (Doc. 8 at 13–14). In so arguing, Plaintiff asserts that "the only records cited during this discussion were notes made by [her] primary caregiver." (*Id.* at 13). Specifically, Plaintiff complains that the ALJ did not discuss the following: (1) Plaintiff's treatment at Woodland Centers; and (2) the fact that she experienced a "significant return of symptoms and positive exam findings occurring in late 2016." (Doc. 8 at 13). Plaintiff's cherry-picking argument falls short.

To start, the ALJ considered Plaintiff's treatment records from Woodland Centers. Most notably, the ALJ cited to the exhibit containing these records when evaluating Dr. Todorov's opinion (Tr. 15, PAGEID #: 64) and when assessing the "paragraph B" criteria concerning Plaintiff's ability to interact with others (Tr. 16, PAGEID #: 65). Moreover, in analyzing the record as a whole and assessing the severity of Plaintiff's mental health conditions, the ALJ relied on therapy notes from Woodland Centers. (*See, e.g.*, Tr. 14, PAGEID #: 63 (citing Woodland

Centers treatment notes, which provide that while Plaintiff expressed a depressed or angry mood and affect, her behavior was adequate); *id.* (citing Woodland Centers treatment notes, which provide that despite Plaintiff's issues controlling her anger, she attempted to volunteer once a month and reported a "big improvement" since starting medication); *id.* (citing Woodland Centers treatment notes pertaining to Plaintiff's marijuana use); Tr. 15, PAGEID #: 64 (citing Woodland Centers treatment notes, which provide that despite Plaintiff's reports of stressors due to situational factors, Plaintiff was cooperative during sessions); Tr. 17, PAGEID #: 66 (same); Tr. 15, PAGEID #: 64 (citing Woodland Centers treatment notes indicating that Plaintiff continued to report improvement with medication and counseling); *id.* (citing Woodland Centers treatment notes indicating that Plaintiff was successful in meeting her goals of refraining from impulsive behavior and reducing anger)). Therefore, despite Plaintiff's allegation that the ALJ overlooked records from Woodland Centers, the ALJ's opinion demonstrates otherwise. Accordingly, the Court finds that the ALJ properly considered this evidence as a part of his overall decision. *See Durio v. Comm'r of Soc. Sec.*, No. 95-1089, 1996 WL 169362, at *2 (6th Cir. Apr. 10, 1996) (explaining that the ALJ did not "ignore" evidence where he discussed it in his decision).

Moreover, Plaintiff's cherry-picking argument is unpersuasive because the ALJ, in reaching her ultimate conclusion, cited to and analyzed substantial evidence concerning Plaintiff's mental health symptoms. (*See, e.g.*, Tr. 14, PAGEID #: 63 (noting that Plaintiff received treatment for anxiety and depression, reported suicidal ideations and had issues with anger); *id.* (noting that Plaintiff was treated at Riverside Hospital for her anxiety); *id.* (noting that Plaintiff expressed a depressed or angry mood and affect); *id.* (noting that Plaintiff told Dr. Todorov that she had a history of interpersonal difficulties, disruptive sleep, depression, and anxiety)). While Plaintiff suggests otherwise, the Court finds that this is not a case where the ALJ overlooked the claimant's

own allegations or medical evidence supporting an impairment. Instead, the ALJ weighed the evidence in its entirety and concluded that Dr. Todorov's opinion was entitled to little weight. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Finally, Plaintiff alleges that the ALJ, in rejecting Dr. Todorov's opinion, failed to discuss records supporting a "significant return" in 2016 of her mental health symptoms. (Doc. 8 at 13). As a threshold matter, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Dykes ex rel. Brymer v. Barnh*art, 112 F. App'x 463, 467 (6th Cir. 2004). *See also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (holding that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."); *Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 703 (E.D. Mich. 2010) (noting that an ALJ is not required to "discuss every piece of evidence in the administrative record").

In any event, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's mental health symptoms were improving with treatment and medication. In particular, the Court finds, based on its analysis of the record, that Plaintiff somewhat overstates the "significant return" of her symptoms. While Plaintiff does not pinpoint specific records supporting her argument, the Court, in giving Plaintiff the benefit of the doubt, assumes that she is referring to her concern that her symptoms were returning in March 2016 (Tr. 449, PAGEID #: 503), her reports to her therapist in January 2017 that she continued to struggle with anger and impulse control (Tr. 797–98, PAGEID #: 852–53), and her reports in April 2017 that she was feeling "very stressed" in anticipation of her upcoming disability benefits hearing (Tr. 865, PAGEID #: 920).

However, the record also indicates that, during this time period, Plaintiff's symptoms were improving with medications and therapy.  For example, on February 17, 2016, Plaintiff told her therapist that she had assisted her friend after surgery and "agree[d] that she was able to "manage remaining problems on her own with skills she has learned through therapy[.]" (Tr. 793, PAGEID #: 848).  At a July 2016 appointment with Dr. Ash, Plaintiff reported that her anxiety and depression were doing well, and Dr. Ash noted Plaintiff's pleasant behavior and appropriate emotional state.  (Tr. 441–42, PAGEID #: 495–96).  And, during a March 13, 2017 appointment, Plaintiff told Dr. Ash she no longer needed medication for sleep, felt things were going well, and reported she was doing well with her medication.  (Tr. 882, PAGEID #: 971).  Dr. Ash's exam notes indicate that Plaintiff was pleasant, alert, oriented, and in no acute distress.  (Tr. 883, PAGEID #: 938).

Accordingly, while Plaintiff may disagree with the ALJ's conclusion, the Court finds that substantial evidence supports the ALJ's assessment of Dr. Todorov's opinion and further finds that the ALJ did not selectively cite the record to reach that conclusion.

**B.    Assessment of Plaintiff's Mental Health Conditions**

Plaintiff also contends that the ALJ failed to "substantially support" her conclusion that Plaintiff's mental health conditions are not severe.  (Doc. 8 at 10).  The Court finds that substantial evidence supports the ALJ's determination that Plaintiff's depression and anxiety conditions are not severe.

A claimant "bears the burden of demonstrating that he suffers from a medically determinable physical impairment" as well as "the burden of showing a severe impairment by medical evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 559 (6th Cir. 2014); *Watters v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 421 (6th Cir. 2013).  The Sixth Circuit construes

the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal

quotation marks and citation omitted), intended to "screen out totally groundless claims." *Farris*

*v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Thus, if an impairment has

"more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must

treat it as "severe." Soc. Sec. Rul. 96–3p, 1996 WL 374181, at *1 (1996). Because the regulations

require an ALJ to consider both severe and non-severe impairments in the remaining steps of the

disability determination analysis, once a severe impairment is found, all impairments, regardless

of how they are classified, will be analyzed in the ALJ's determination. *See Dyer v. Colvin*, No.

CV-14-156-DLB, 2016 WL 1077906, at *3 (E.D. Ky. Mar. 17, 2016). "For this reason, the Sixth

Circuit has consistently held that an ALJ does not commit reversible error when he or she decides

that some of claimant's impairments are not severe, but finds that other impairments are severe

and proceeds with his or her analysis." *Id.*

In this case, the issue is not whether this Court would come out differently on the severity

determination, but whether substantial evidence supports the ALJ's finding. *See Reed v. Colvin*,

No. CIV. 13-54-GFVT, 2014 WL 318569, at *3 (E.D. Ky. Jan. 29, 2014) ("The limited nature of

substantial evidence review prevents the reviewing court from substituting its judgment for that of

the ALJ."). Here, the Court finds that substantial evidence supports the ALJ's classification of

Plaintiff's anxiety and depressive disorders as non-severe.

Plaintiff, despite continuing to struggle with anger issues, had a positive response to

medication and therapy. (*See, e.g.*, Tr. 536, PAGEID #: 500 (noting that Plaintiff told Dr. Ash that

her depression was well controlled with medications and that, because of her medications, she felt

like she could get out of bed in the morning, bathe, get dressed, and tend to her daily activities);

Tr. 760, PAGEID #: 815 (noting that Plaintiff's symptoms had improved since increasing her

medications and that she had enjoyed spending the previous day with her sister, stating, "[i]t felt great to "get some sun" and plant flowers); Tr. 761, PAGEID #: 816 (noting that Plaintiff attributed her change in attitude to medications and therapy); Tr. 762–63, PAGEID #: 817–18 (noting that Plaintiff stated, "I swear it's the Abilify that's made it better."); Tr. 767, PAGEID #: 822 (listing "several successes" between therapy visits); Tr. 778, PAGEID #: 833 (noting that Plaintiff told her therapist that she was doing "so much better than when [she] first started coming" and that she "feels so good right now"); Tr. 793, PAGEID #: 848 (noting that Plaintiff agreed that she was able to "manage remaining problems on her own with skills she has learned through therapy"); Tr. 882, PAGEID #: 971 (noting that Plaintiff felt she no longer needed medication for sleep, felt things were going well, and reported she was doing well with her medication)). Moreover, Plaintiff cared for her grandchildren (Tr. 61, PAGEID #: 110), volunteered in her community, albeit not as frequently as she intended (Tr. 771, PAGEID #: 826), and enjoyed spending time outdoors with her family (Tr. 760, PAGEID #: 815).

At bottom, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's mental health conditions are not severe. In formulating her RFC, the ALJ properly considered Plaintiff's mental health conditions, in addition to her other severe and non-severe conditions. Accordingly, Plaintiff has failed to demonstrate reversible error. *See, e.g.*, *Born v. Berryhill*, No. 3:14-cv-01946, 2017 WL 2376921, at *6–8 (M.D. Tenn. June 1, 2017) (holding that while "the court may not have reached the same decision, given the *de minimis* threshold for showing a severe impairment constitutes reversible error" the ALJ properly proceeded to the remaining steps of the analysis and "considered all of [plaintiff's] impairments, including his mental impairments").

Finally, Plaintiff, cursorily suggests that the ALJ erred because her RFC "did not contain any mental health limitations on [her] capacity to perform work." (Doc. 8 at 11). As an initial matter, the Court finds that Plaintiff has likely waived her RFC argument. The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief as well as arguments adverted to in only a perfunctory manner are waived." *Kuhn v. Washtenaw Count*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (finding that a plaintiff's failure to develop an argument challenging an ALJ's conclusion amounts to a waiver of that argument); *Williams v. Comm'r of Soc. Sec.*, No. 1:16-CV-347, 2017 WL 65837, at *6–7 (S.D. Ohio Jan. 6, 2017), *report and recommendation adopted*, No. 1:16CV347, 2017 WL 432808 (S.D. Ohio Jan. 31, 2017) (holding that plaintiff waived her argument challenging the ALJ's credibility finding because she had "neither legally nor factually developed" that argument). Here, Plaintiff's one-sentence reference to the ALJ's RFC finding is "neither legally nor factually developed." *See id.*

Regardless, even if Plaintiff has not waived her argument challenging the ALJ's RFC, the Court finds that substantial evidence supports the ALJ's RFC finding. "[T]he case law does not require an ALJ to include limitations for non-severe impairments; the case law requires the ALJ to *consider* the claimant's non-severe impairments." *Lewis v. Comm'r of Soc. Sec. Admin.*, No. 5:17-CV-2438, 2018 WL 4615961, at *9 (N.D. Ohio Sept. 26, 2018) (emphasis in original) (citations omitted). Here, as discussed in detail above, the ALJ considered Plaintiff's non-severe impairments when weighing the evidence as a whole and formulating her RFC assessment. *See, e.g., Born*, 2017 WL 2376921, at *7 (noting that, while the ALJ did not include any mental health limitations in the RFC, the ALJ properly summarized relevant record evidence, including plaintiff's inability to sleep due to panic attacks, plaintiff's prescription for Xanax, and plaintiff's

own testimony regarding his mood swings, and concluded that the evidence as a whole supported her RFC finding). Here, the ALJ properly considered Plaintiff's mental health limitations when formulating her RFC, and the Court finds that substantial evidence supports her finding.

Ultimately, the Court must decide if substantial evidence supports the ALJ's conclusion. Indeed, "[i]f substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have reached an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 592, 595 (6th Cir. 2005) (internal quotations omitted). Taking into account all that the ALJ considered, substantial evidence supports her RFC determination.

## IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V.      PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: November 13, 2018           /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE